LAW OFFICES OF
# STEPHEN TURANO

———

sturano@turanolaw.com

| | |
|---|---|
| 275 MADISON AVENUE<br>35TH FLOOR<br>NEW YORK, NY 10016 | 60 PARK PLACE<br>SUITE 703<br>NEWARK, NJ 07102 |
| TEL (917) 974-1781<br>FAX (212) 208-2981 | TEL (973) 648-6777<br>FAX (212) 208-2981 |

September 26, 2017

The Honorable Alison J. Nathan
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

      Re:   <u>United States v. Ricardo Burgess</u>
              Case No. 15 Cr. 95 (AJN)

Dear Judge Nathan:

      This firm represents Ricardo Burgess ("Ricardo") on the above-referenced matter. On March 29, 2017, Ricardo pled guilty to Count Two of the Superseding Indictment, charging a conspiracy to distribute and possession with intent to distribute 280 grams of crack cocaine, in violation of 21 U.S.C. § 841(b)(1)(A), and 100 kilograms or more of marihuana, in violation of 21 U.S.C. § 841(b)(1)(B). Under the terms of the plea agreement, Ricardo will plead to the lesser included offense of conspiracy to distribute mixtures containing a detectable amount of cocaine base in violation of 21 U.S.C. § 841(b)(1)(C), which does not carry a mandatory minimum sentence. Ricardo is scheduled to be sentenced on October 3, 2017. The defense respectfully submits this memorandum in advance of that sentencing.

1

Ricardo committed a serious crime and takes full responsibility for his actions. None of the mitigation arguments contained in this submission are intended to excuse Ricardo's conduct or to avoid acceptance of responsibility. Given, however, his life circumstances, his role in the overall conspiracy, and the sentences of his co-defendants, the defense respectfully request that the Court impose a sentence of no greater than 48 months of custodial supervision.

**Background**

As the Court is aware, this case arose from an overarching, multi-defendant conspiracy investigated by federal and local law enforcement into a street gang—Big Money Bosses ("BMB")—operating in the Bronx, New York. The investigation revealed that, from 2007 until 2016, members of BMB were involved in racketeering acts, including murders, attempted murders, gang assaults, robberies, crack and marijuana trafficking, bank fraud, and counterfeiting.

The plea agreement entered into between Ricardo and the Government provides that, pursuant to U.S.S.G. §§ 2D1.1 (a)(5) and 2D1.1(c)(5), the base offense level is 30. It also provides that, pursuant to U.S.S.G. § 2D1.1(b)(1), a two-level increase applies because a dangerous weapon was possessed by Ricardo as evidenced by the cell phone video described below. Probation credits Ricardo with acceptance of responsibility (see Ricardo's Presentence Report, dated May 23, 2017 ("PSR") ¶¶ 45 and 46) for a total offense level of 29. PSR ¶ 47. Finally, the plea agreement permits defense counsel to seek a downward departure under 18 U.S.C. § 3553(a) factors, which are addressed herein.

**Legal Standard**

As the Court is well aware, the United States Sentencing Guidelines ("Guidelines") are not binding, pursuant to *United States v. Booker*, 125 S.Ct. 738, 2005 WL 50108 (Jan. 12, 2005). And, while the Court is nevertheless bound to "consider" them in fashioning an appropriate sentence, *see United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), they do not incorporate all of the sentencing purposes or factors set forth in 18 U.S.C. §3553(a). The United States Sentencing Commission itself acknowledged, when first promulgating the Guidelines, that it was impossible to devise a guidelines system that captures and accounts for "the vast range of human conduct potentially relevant to a sentencing decision." U.S.S.G. ch.1, pt. A(4)(b)(1987).

We also respectfully submit that a consideration of statutory directives in 18 U.S.C. §3553 and those factors listed in U.S.S.G. § 5H1 provides further support for the imposition of the sentence urged here. The Supreme Court's holding in *Booker*, 543 U.S. at 245-46, requires sentencing courts to consider, in addition to the Guidelines themselves, the broad directives set forth in 18 U.S.C § 3553(a). *See also United States v. Fernandez*, 443 F.3d 19 (2d Cir. 2006). That section requires courts to "impose a sentence sufficient, <u>but not greater than necessary</u>, to comply with the purposes set forth in paragraph 2." 18 U.S.C. § 3553(a) (emphasis added). *See also United States v. Johnson*, 964 F.2d 124, 125 (2d Cir. 1992) (Guidelines "do not require a judge to leave compassion and common sense at the door to the courtroom"). Paragraph (2) states such purposes are:

    (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)    to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with the needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Section 3553(a) further directs sentencing courts to consider such diverse factors as: the history and characteristics of the defendant; the kinds of sentences available; and the need to avoid unwanted sentencing disparities. 18 U.S.C. § 3553(a)(1)-(7). The Supreme Court's holding in *Booker* also permits this Court to consider those factors listed in U.S.S.G. § 5H1, including those very much applicable here: education and vocational skills (U.S.S.G. §5H1.2), mental and emotional condition (U.S.S.G. §5H1.3), family ties and responsibilities (U.S.S.G. §5H1.6), socioeconomic status (U.S.S.G. §5H1.10), lack of guidance as a youth and similar circumstances indicating a disadvantaged upbringing (U.S.S.G. §5H1.12), and duress relating to "personal financial difficulties and economic pressures upon a trade or business" (U.S.S.G. §5K2.12).

The Supreme Court has continued to clarify the relative weight sentencing courts should afford the Guidelines. *Gall v. U.S.*, 552 U.S. 38, 49 (2007); *Rita v. U.S.*, 127 S.Ct. 2456, 2465 (2007). Specifically, in *Rita*, the Supreme Court stated that "the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines should apply." 127 S.Ct. at 2465 (2007) (citing *Booker*, 543 U.S., at 259-260). Then, in *Gall*, the Court rejected a standard of review which would require the strength of the underlying justification for a departure from the Guidelines to be "proportional" to the degree of the departure and confirmed that the abuse of discretion standard applies to sentences both within and outside the Guidelines. *Gall*, 552 U.S. at 49. In arriving at this decision, the Court also rebuffed any notion that sentences outside the Guidelines required

4

extraordinary circumstances. *Id.* Based upon these developments, we submit that the Guidelines carry no greater weight than the other sentencing factors under 18 U.S.C. §3553 or U.S.S.G. § 5H1.

In sum, a court must impose a lesser sentence if it is sufficient to comply with Section 3553(a)'s sentencing purpose. *United States v. Dorvee*, 616 F.3d 174, 183 (2d Cir. 2010). Specifically, a sentencing court must fashion a sentence that is "sufficient, but not greater than necessary" to achieve the goals of punishment, deterrence, and rehabilitation. *Kimbrough v. United States*, 522 U.S. 85, 101 (2007) (*quoting* 18 U.S.C. § 3553(a)).

**Arguments in Favor of a Custodial Sentence No Greater Than 48 Months**

1. <u>Ricardo's Difficult Childhood and Life Circumstances Warrant Leniency</u>[1]

Ricardo is a 39-year-old Jamaican male currently awaiting sentencing at the Metropolitan Correctional Center ("MCC"). Ricardo deeply regrets the actions that led to this prosecution and, in particular, his decision to associate with individuals considerably younger than him who were involved in gang activity. Importantly, he has used this time to reflect on his past transgressions and is working on a plan for a positive reentry into the community.

This offense marks the first time Ricardo has been incarcerated—a loss of liberty which has taken a significant toll on him and his family. During numerous meetings with defense counsel and Ms. Albarus, Ricardo appeared significantly depressed and anxious,

---

[1] The information contained in this sentencing memorandum was obtained largely from a review of the discovery and from interviews by mitigation specialist Carmeta Albarus ("Ms. Albarus") with Ricardo, his sister, Natisha Duncan ("Natisha"), his maternal aunt, Iona Davy ("Iona"), and others. The letters the defense team received to date on Ricardo's behalf are attached hereto as Exhibit A.

5

which has been made worse by the prospect of deportation to Jamaica upon completion of his custodial sentence.

A defendant's background, including childhood, family circumstances, and character may warrant a below-Guideline-range sentence. 18 U.S.C. § 3553(a)(1) & (2)(c) (instructing courts to consider "the history and characteristics of the defendant" and the need "to protect the public from further crimes of the defendant"). *See*, *e.g.*, *United States v. Johnson*, 964 F.2d at 128. (family circumstances justify departure). The conduct that led Ricardo to appear before the Court is, in large part, a byproduct of a difficult childhood, repeated tragedy, and resulting, untreated depression.

Ricardo was born on November 14, 1977, in Jamaica. PSR at ¶ 57. He is the second of three children born to his mother, Bernice Davy ("Bernice"), with whom he remained extremely close until her death in 2007. *Id*. Ricardo's siblings, who share a different father, are Ewan Duncan ("Ewan"), now deceased, and Natisha Duncan, age 35. *Id*. Unfortunately, Ricardo never met his father, a man with whom Bernice had a brief affair.

Ricardo spent his childhood and young adulthood in Jamaica, plagued by poverty and violence stemming from the rotating transfer of power between the two predominant political parties.[2] Some of Ricardo's early memories are of the "political warfare" he witnessed first-hand in Jamaica. Ricardo still has visons of people burning in tires and vividly recalls the smell of burning flesh and the sound of gunshots.

---

[2] *See Murder and Politics in Jamaica: A Historical Quantitative Analysis*, 10970-2009, published in Asian Journal of Business, June 25, 2012.

6

The day-to-day life in Garrison Communities[3] were controlled by area enforcers known as "Dons." The Dons decided how political benefits—jobs, food, and housing were distributed to local residents. If one's allegiance to the Dons was doubted it could result in disenfranchisement and even loss of life. Natisha and Iona confirm that the law in those communities was not decided by the government, but by the area Dons who enforced allegiance to whichever political party represents that area. Ricardo recalls his family and other residents living in both fear and reverence of the Dons.

Growing up in Jamaica, Ricardo lived in a tenement with other families who shared a toilet, shower, kitchen, and yard. For Ricardo, the conditions in the tenement were daily reminders of poverty, denigration, powerlessness, and vulnerability to violence. (Attached hereto as Exhibit B, are photographs of the Waterhouse and Matthews Lane areas where Ricardo lived. Although the photographs were taken recently, according to Ricardo, they accurately depict the conditions under which he was raised.)

According to Natisha, life in Jamaica was difficult for all of them, but it was particularly hard on her brothers to survive these living conditions and to navigate the political environment as young men growing up without a father. This void also meant that Bernice was the sole financial provider for the family. Natisha and Ricardo reported that their mother made money by selling chicken parts on the street and the meager

---

[3] Both the Waterhouse and Matthews Lane, where Ricardo was raised, were called "Garrison Communities" or "Garrisons." These communities were the product of the divisive and polarized culture created by the political leaders as a means of cementing their power. They tended to be inhabited by poor or working-class people who were heavily reliant on the beneficence of whatever political party to which they were aligned. *See Garrisons: Empires of the Dons'*, by Damion Blake; Jamaican Gleaner, February 27, 2012.

income she made was unable to adequate support them. Ricardo also recalls many days when he did not get a meal and remembers the frequent "hunger pains" he endured as a child.

The financial hardship, the continuing constraints imposed by political tribalism, and the devastating effects of hurricane Gilbert, lead Bernice to migrate to the United States in 1989. She left her three children in the care of her then boyfriend and their aunt, Iona. Although neither would elaborate, Natisha and Ricardo reported severe "mistreatment" at the hands of these "caregivers."

While not confirming the alleged mistreatment, Iona acknowledged that she could not afford to render substantial assistance to her nephew (Ricardo) and niece (Natisha) after Bernice left for the United States. Iona also confirmed the poverty and terror under which Ricardo and the residents of the community lived. Similar to Ricardo's, Iona described seeing dead bodied dumped on the streets and in trash receptacles.

In addition to abject poverty, the children experienced first-hand the violence of the political climate. Iona describes a growing dispute between Ricardo's uncle, Desmond Murray ("Desmond"), and the local Don, whose name is withheld for fear of retaliation, but referred to herein as "Zekes". According to Iona, Desmond used money he was supposed to launder for Zekes. Desmond was killed and other members of the family feared for their lives. Fearing further retaliation, Ewan, at Bernice's urging, entered the United States in 1992, followed by Natisha, in 1993. Ricardo was again left behind in Jamaica.

Ricardo recalls his life becoming more difficult in his family's absence. His aunt, Iona, would often lock him out of the home, making it difficult for him to even attend

school. Ricardo was only 16 years old when he moved in with a "girl" who also lived in the tenement. To support himself, Ricardo sold candy and chips he bought with the little money his mother sent him from the United States. Unfortunately, the family could not escape the violence they tried to leave behind in Jamaica. Natisha, reported to Ms. Albarus that Ewan was murder in Brooklyn in 1993 by Jamaicans she believed were affiliated with Zeke.

      Fearful that her younger son would be further exposed to the tribal war in Jamaica, in 1994, Bernice finally made arrangement for Ricardo to travel to the United States to join her. He traveled to the United States on an illegal visa. One of first things Ricardo did upon his arrival to New York was to pay a visit to Ewan's grave in Valhalla, New York. "I went there and took flowers," he remarked, adding that his brother was only 19 years old when he was murdered.

      Ricardo's poor education and attendance at school in Jamaica left him at a significant disadvantage when he entered high school in the Bronx. Ricardo's school transcript shows that he was admitted into public high school (Harry S. Truman High School in the Bronx) on September 9, 1994, but discharged on June 26, 1996.[4] See PSR at ¶ 64.  He attended only two semesters, and his cumulative average was 51.43%. *Id*. Ricardo describes his schooling as a "struggle," and stated that it was widely recognized that he had learning problems and was to be evaluated for Special Ed services. The evaluation never took place because he and his mother changed addresses so frequently.

---

[4] Ricardo attended Chetolah Park Primary School and Kingston High School in Jamaica, but defense counsel was unable to locate school records. Attached hereto as Exhibit C is Ricardo's Kingston High School admission record.

9

Ricardo remembered that financial conditions at home went from bad to worse after his sister started having children. Much of the financial burden rested on his mother, as neither he nor his sister had legal status. Despite the economic burden, Ricardo said that his mother was "overly protective" of him, not wanting him to work or go "on the street." "She was afraid they'd kill me like they killed my brother," he explained. Ricardo said that with no education and a lack of marketable job skills, the only work he could get was delivering "weed packages" for some of the dealers in the neighborhood, which was not nearly enough to support himself and his family.

Despite his attachment to his mother, Ricardo recounted how he tried to make it on his own. In 2000, he became involved in a romantic relationship with Sheryl Reid ("Sheryl"), who would become the mother of his two sons. In an interview with Ms. Albarus, Sheryl confirmed that she and Ricardo have been together "on and off" for about 14 years and have two sons, SR (age 17) and JR (age 9).[5] Sheryl stated that Ricardo has always been a "good and loving father" to their sons. See also PSR at ¶¶ 59-60.

In 2006, when in his late twenties, Ricardo reports that his life took an even more tragic turn when his mother was diagnosed with Lymphoma. Natisha stated that this was a big blow to the family and especially for Ricardo, who took her illness and death one year later "extremely hard." Iona confirmed the devastating affect Bernice's diagnosis and death had on Ricardo and recalls him going into a "deep depression" after her death. Ricardo expressed the profound loss he continues to feel after his mother's death. Even now, Ricardo becomes emotional every time the subject of his mother comes up.

---

[5] Names of Ricardo's minor children are abbreviated pursuant to Federal Rule of Criminal Procedure 49.1 (a)(3).

In 2010, Ricardo was shot in the chest. PSR at ¶ 61. He believes that the shooting was related to his family's feud between Zekes.[6] Soon after he recovered, Ricardo moved from the Bronx to New Jersey to avoid future attempts on his life. By then, Iona was operating a Jamaican Restaurant (Island Rock) in East Orange, New Jersey, and she gave him the opportunity to work in the restaurant and live with her. PSR at ¶ 65. Iona said it was a pleasure having Ricardo around and remarked that he "was better to me than my own son." She said that Ricardo was always respectful and quiet.  "He was never the type of child to get into trouble and while he was here he just kept to himself."

    2.  <u>Supportive and Caring Nature Toward Family</u>

Despite his traumatic and difficult life as a child in Jamaica and as a young man in New York, Ricardo remained a devoted and loving son, brother, uncle and father. In fact, Ricardo's involvement selling drugs were primarily driven by his determination to provide for his family as best as he believed he could at the time, given his illegal immigration status, poor education and limited job opportunities.

The letters of support submitted to the Court attest to Ricardo's love for and devotion to his children. Despite their differences, Sheryl attests to the fact that Ricardo has a "warm heart" and "soul," and his children care very deeply for him. She discusses the toll his incarceration has had on their sons. In fact, Ricardo expressed great regret that

---

[6] Ricardo stated that his aunt Precious and her son Miguel was murdered on the order of Zeke because her brother Norris had testified against him despite having relocated from Matthew Lane. It was reported that the door to her house was kicked down and both she and her son were shot to death. Her younger twins (about 6 years old) survived because Precious hid them in a barrel container. Ricardo reported as well that his two paternal brothers, Damion and Junior Burgess, were murdered in 2008 as a result of political violence.

11

his incarceration prevents him from helping his oldest son, now 16 years old, to avoid the reach of street gangs, violence and drugs.

Despite his incarceration, Ricardo has done his best to maintain his relationship with his sons. His love and dedication to them provided motivation to avail himself to self- improvement opportunities offered at the MCC. He has successfully completed: the ACE Women's History Program, earning a certificate of participation on April 12, 2017; Independent Study, Black History, earning a certificate of completion on July 28, 2017; and Drug Education, earning a certificate of achievement on August 9, 2017.

Ricardo was also a loving and devoted uncle to his sister's child, Samantha, who died in 2015 from Lymphoma—the same cancer that killed his mother. Ironically, it was Samantha's diagnosis and illness that led Ricardo back to the Bronx, and his involvement in the charged conspiracy. In late 2013 or early 2014, forgoing his own safety and wellbeing, Ricardo left his job and life in New Jersey to return to the Bronx to help care for Samantha. Ricardo and Samantha shared an extremely close relationship—they lived in the same home for much of Samantha's life. Ricardo admits that he "sold weed" to help support Natisha and her children, especially Samantha, who he very much wanted to provide some measure of comfort to her life before her tragic death.

In arriving at a sentence, the Court should consider the positive impact Ricardo has had on his family (*see United States v. Davis*, 2008 WL 2329290, at *1, 5 (S.D.N.Y. June 5, 2018)) (granting below-Guideline sentence based largely on the "significant positive impact" defendant had on family) and the hardships Ricardo and his family, particularly his children, will suffer during his incarceration (*see Valenia v. United States*, 2012 WL 701227, at *2-3 (S.D.N.Y. Mar. 6, 2012)) (court considered financial hardship

on family during defendant's incarceration). It is hoped that the court will take into consideration Ricardo's social history inclusive of the mitigating factors as he presents for sentencing.

> 3. Ricardo's Limited Involvement in the Conspiracy and the Need to Avoid Sentencing Disparity Warrants a Below-Guideline Sentence

The voluminous discovery details co-defendants' narcotics trafficking and violent gang activity, most of which was done to secure their respective roles in the street gang. In starch contrast to his co-defendants, the discovery pertaining to Ricardo suggest a different story. First, Ricardo's involvement in the conspiracy did not begin until late 2013 or early 2014, nearly seven years after the charged conspiracy was underway. Second, Ricardo denies being a member of the BMB street gang. He acknowledges, however, that he was an associate of co-defendants and BMB gang members Javone Pearce ("Pearce") and Richard Phillips (Phillips"). Third, Ricardo is not named in a single act of gang violence in the Superseding Indictment.

Instead, the discovery pertaining to Ricardo details only a limited number of narcotics-related conversations between Ricardo and Phillips in late August of 2015. Specifically, during intercepted calls, Ricardo and Phillips complained that Pearce had not been making his marijuana supply available to them despite the fact that they were paying rent to Pearce for a house on 230th Street available for storing and selling drugs. Several other intercepted calls and text messages between Ricardo and Phillips established that the two men were engaged in the sale of marijuana. There are no conversations or evidence in the discovery describing acts of violence, fraud, or even sales of crack. *See*, *e.g.*, Presentence Report ("PSR") at ¶¶ 27-31.

Finally, included in the voluminous discovery is a video from a co-defendant's cellphone, taken from inside Pearce's "trap house," showing Ricardo lifting his shirt for the camera to reveal a firearm in his waistband while in the presence of BMB associates Hakeem Campbell and Lamar Francis. *See*, *e.g*. PSR at ¶ 32. Apart from the video, the defense is not aware of any evidence that Ricardo ever directly brandished a firearm in connection with the sale of crack or marijuana.

Given Ricardo's conduct, the defense submits that the Guideline range contemplated in the plea agreement and calculated by Probation in the PSR is greater than necessary. Ricardo was not involved in the most dangerous aspects of the racketeering conspiracy, specifically the many acts of gang violence. Although Ricardo associated with several of BMB members or associates, he himself was not a BMB member. Moreover, Ricardo's association began years after the charged conspiracy began only when he returned to the Bronx neighborhood to help take care of his terminally ill niece.

As stated above, Ricardo does not dispute or in any way contradict his plea allocution, which included the sale of marijuana and crack. The voluminous discovery, however, supports the defense's position that the vast majority of Ricardo's activity in connection with the charged conspiracy involved the sale of marijuana, not crack. In fact, any activity involving the sale of crack was an outlier and his primary participation in the racketeering conspiracy dealt with the sale of marijuana. See PSR¶¶ 27-31.  Therefore, given that the advisory Guideline range is driven primarily by the sale of crack from the overall conspiracy, a downward variance is required to adequately reflect Ricardo's role in the conspiracy. *See United States v. McGowan*, 288 F.App'x 288, 291-92 (7th Cir.

2008) (affirming variance to reflect defendant's role in primarily selling powder cocaine instead of crack cocaine).

Moreover, similarly situated defendants have received lower sentences in this case. For example:

> *United States v. Rushaun Brown*, 15 CR 95 (AJN) (S.D.N.Y. January 5, 2017): sentenced to 36 months. Unlike Ricardo, however, co-defendant Brown had a criminal record, primarily distributed crack cocaine, and was charged in BMB's fraud offenses.
>
> *United States v. Mark Williams*, 15 CR 95 (AJN) (S.D.N.Y. May 23, 2017): sentenced to 24 months despite evidence that co-defendant Williams was a "frequent" and "regular" crack dealer.
>
> *United States v. Bradley Wilson*, 15 CR 95 (AJN) (S.D.N.Y. December 16, 2016): sentenced to 24 months despite evidence that co-defendant Wilson was a "frequent" and "regular" crack dealer.
>
> *United States v. Lamar Francis*, 15 CR 95 (AJN) (S.D.N.Y. July 20, 2017): sentenced to 48 months where co-defendant Francis was, in addition to narcotics trafficking, involved in violent offenses and, like Ricardo, received an enhancement for possession of a firearm.
>
> *United States v. Robert Feliciano*, 15 CR 95 (AJN) (S.D.N.Y. November 28, 2016): sentenced to 48 months where co-defendant Feliciano was, in addition to narcotics trafficking, involved in violent offenses and, like Ricardo, received an enhancement for possession of a firearm.
>
> *United States v. Anthony Letterio*, 15 CR 95 (AJN) (S.D.N.Y.): sentenced to 24 months despite pleading to a leadership role with BMB and a Guideline range of 63-78 months.
>
> *United States v. Shaquille Dewar*, 15 CR 95 (AJN) (S.D.N.Y. July 5, 2017): sentenced to 48 months despite being heavily involved in BMB gang membership.
>
> *United States v. Robert Haughton*, 15 CR 95 (AJN) (S.D.N.Y. April 4, 2017): sentenced to 60 months despite being heavily involved in BMB gang membership.

4. Ricardo's Criminal History

Unlike many of his other co-defendants, Ricardo falls within Criminal History Category I. *See* PSR ¶ 53. Specifically, Ricardo's criminal history is limited to a 2001 arrest for a petit larceny, for which the PSR indicates he was sentenced to time served, and a 2006 arrest for marijuana possession, which resulted in a fine and no criminal conviction. *See* PSR at ¶¶ 40- 55. Moreover, the arrests predate Ricardo's entrance into the charged conspiracy by more than ten years.

5. Medical and Emotional History

Ricardo reports that the 2010 shooting resulted in a metal plate in his chest, which causes him discomfort and breathing problems. (Medical records from Jacobi Hospital where he was treated for the gunshot wound are still pending). See PSR ¶ 61.

Although Ricardo could not verify whether or not he was 'formally diagnosed with depression, he reported that he was prescribed Citalopram at MCC, which is a known antidepressant. He also identified "Dr. Oh and Dr. Alvina" as the doctors who have treated him at the MCC. In addition, Ricardo reported having suicidal ideations. He is under suicide watch at the MCC. PSR at ¶ 62.

In meetings with his defense team he has indicated a number of symptoms associated with depression. These include feelings of sadness, emptiness and hopelessness. Ricardo cries during meetings with his defense team. He has reported being plagued by difficulty in sleeping and concentration, fatigue, and lack of energy for many years, which may also be attributable to undiagnosed depression. *See e.g.*, PSR ¶ 62.

6. <u>Acceptance of Responsibility</u>

Ricardo has fully accepted responsibility for his actions and expresses great remorse for his poor decisions and criminal conduct. On March 29, 2017, Ricardo entered a guilty plea and voluntarily recognized the wrongfulness of his actions. As Ricardo writes, he wants to apologize to the Court, his family and, especially his children for his actions. He recognizes that his conduct was an embarrassment to himself and his loved ones and were very irresponsible of him as a father. The Probation Department found that Ricardo accepted responsibility and agrees he is eligible for a three-level downward adjustment for acceptance of responsibility under U.S.S.G. §3E1.1(a) and (b). PSR ¶¶ 36, 45-46.

7. <u>Conditions of Confinement</u>

Ricardo has been incarcerated at the MCC for 14 months. Like other inmates at the MCC, Ricardo has endured substandard conditions, including infestations, lack of exercise, poor food, and inadequate mental-health care. Ricardo reports that he has developed a fungus on his leg that is spreading and for which he has not received treatment. Most significantly, Ricardo has clearly showed symptoms of severe depression. Although MCC has provided him with Citalopram, an antidepressant, unfortunately, the underlying issues that has led to lifelong depression have not been addressed.

The 14 months spent under these pre-sentence conditions should be considered by the Court. *See, e.g. United States v. Carty,* 264 F.3d 191, 196 (2d Cir. 2001) ("pre-sentence confinement may in appropriate cases be a permissible basis for downward

departure"); *United States v. Behr*, 2006 WL 1586563, at *5 (S.D.N.Y. June 9, 2006 (Sweet, J.) (described MCC as "overcrowded," and "unsanitary").

    8. History of Substance Abuse

Ricardo reports a history of substance abuse that started when he was 16 years old. PSR at ¶ 63. After his mother death, Ricardo became very depressed and in addition to smoking marijuana, he began to take non-prescribed Percocet (*Id.*) to relieve his symptoms. He has also used Ecstasy and drank alcohol as a way of self-medicating. *Id*. Hopefully, the drug education course he completed at the MCC will help him to better identify triggers and to mitigate his reliance on illicit drugs.

    9. Likely Deportation

Post-*Booker*, the fact that a defendant's conviction will result in deportation should be considered by the sentencing court. *See, e.g., Scheidemann v. I.N.S.*, 83 F.3d 1517, 1527 (3d Cir. 1996) ("the defendant entered this country at age 12; he has lived here for 36 years . . . he has raised 3 children all of whom are American citizens . . . 2 of his 4 siblings are naturalized American citizens . . . he has no ties to Columbia, the country to which he is to be deported; and he has fully served the sentence imposed upon him . . . If deportation under such circumstances is not punishment, it is difficult to envision what is."); *Jordan v. DeGeorge*, 341 U.S. 223, 232 (1951) (Jackson, J.) (deportation is "a life sentence of banishment in addition to the punishment which a citizen would suffer from the identical acts."); *United States v. Biheiri*, 356 F.Supp.2d 589 (E.D. Va. 2005) (post-*Booker*, where Egyptian defendant convicted of terrorism financing, judge imposed a sentence of thirteen months and one day, far less than the advisory guideline, reasoning, in part, "[b]ecause Biheiri will be deported to Egypt

immediately following his release from confinement, the goals of protecting the public and providing rehabilitative opportunities are of little import in the instant circumstances"); *United States v. Wills*, 476 F.3d 103 (2d Cir. 2007) (recognizing that deportation may be factor for imposing below guideline sentence).

Here, because Ricardo entered the United States illegally and never obtained legal status, it is likely he will be deported to Jamaica after the completion of his incarceration. This is particularly troubling given Jamaica's history of violence and, in particular, Ricardo's family's history of victimization at the hands of the "political" factions.

10. <u>Incarceration Not Necessary to Deter Ricardo in the Future</u>

As stated, Ricardo is remorseful for his actions and since his arrest developed greater insight into the wrongfulness of his actions. His arrest and incarceration thus far is of no small consequence. He will, by his own hand, endure (i) the embarrassment and shame of an arrest and federal conviction, (ii) great emotional stress and severe depression during the pendency of his incarceration, and (iii) likely deportation. Ricardo has suffered by his own actions, significant harm and additional incarceration is not necessary to deter this defendant from similar actions in the future.

**Conclusion**

For the reasons set forth above, the defense respectfully requests that the Court impose a below-Guideline sentence of no greater than 48 months of incarceration. This sentence would most appropriately reflect Ricardo's role in the offense, the circumstances contributing to his conduct, his mental-health issues, the remorse and responsibility he has demonstrated, and conformity of sentences. Moreover, the requested

custodial term is "sufficient, but not greater than necessary" to achieve the objectives of sentencing in this case.

Respectfully submitted,

/s/

STEPHEN TURANO

Encs.
cc:  Rachel Maimin, AUSA